IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ATTORNEY GENERAL MERRICK GARLAND, in his official capacity, UNITED STATES DEPARTMENT OF JUSTICE, FBI DIRECTOR CHRISTOPHER A. WRAY, in his official capacity, FEDERAL BUREAU OF INVESTIGATION,<br><br>                    Movants,<br><br>v.<br><br>PETER P. STRZOK<br><br>IN RE SUBPOENA SERVED ON DONALD J. TRUMP | **REDACTED**<br><br>Case No. 1:22-mc-00027-ABJ<br><br>Related: *Strzok v. Garland, et al.*, 1:19-CV-2367-ABJ (D.D.C); *Page v. DOJ, et al.*, 1:19-cv-03675-TSC (D.D.C) |

## OPPOSITION TO MOTION TO QUASH OR FOR PROTECTIVE ORDER

Taking pains to emphasize that they are not defending his conduct (Motion n.2, ECF No. 2), Defendants seek an order preventing or delaying the deposition of former President Donald Trump.[1] Defendants argue that before deposing the former president, Plaintiff Peter Strzok must first show that Mr. Trump has unique personal knowledge, relevant to the claims at issue in the lawsuit, which is not available from other sources. That showing is easily made, and Defendants' motion to quash the deposition must therefore be denied. In contrast to most "apex" cases, the volume, tone, and substance of Mr. Trump's statements over the course of four years and his intent

---

[1] Defendants filed the Motion in the Southern District of New York. Judge Broderick order the Motion transferred the Motion to this court with consent of the parties on February 1, 2022 after indicating that this Court should set the briefing schedule. *See In re Subpoena Served on Donald J. Trump*, Case No. 1:22-mc-00020 (S.D.N.Y.).

1

and goals in making them are an essential factual issue in this case, and it is difficult to imagine how it can be litigated or tried without hearing Mr. Trump's testimony.

Mr. Trump demanded the firing of Peter Strzok before the FBI imposed discipline, and he has repeatedly taken credit for Strzok's firing since. Based on his own public confessions, the former president has implicated himself in the firing of Special Agent Strzok. He has "unique knowledge" of what actions he took to influence the outcome of the FBI's disciplinary process, and he is the only person with direct knowledge of his state of mind in doing so. Relatedly, he is the only person who can definitively clarify the meaning of his public statements taking credit for Mr. Strzok's termination. Thus, whether analyzed under "apex doctrine" principles as applied in the Second Circuit or the District of Columbia Circuit, the deposition of former President Trump is warranted, appropriate, and necessary.

## BACKGROUND

Peter Strzok was improperly fired by the FBI under unprecedented and highly suspicious circumstances. The FBI overturned the final disciplinary action of the duly designated "deciding official" (Assistant Director Candice M. Will, "AD Will"), who had been responsible for issuing final disciplinary decisions upon senior FBI leaders for nearly a decade, and who determined that, consistent with prior precedent, it was *not* in the Bureau's best interests to fire Special Agent Strzok. AD Will instead accepted a Last Chance Agreement and imposed lesser discipline that permitted Strzok's continued service with the Bureau. AD Will premised this decision on Strzok's conduct, his long record of outstanding service to the FBI, including his successful leadership of some of the Bureau's most important investigations, and the relevant precedent. She also specifically noted the input from management in Strzok's assigned Division, which affirmed that "you are an extremely talented and intelligent investigator, gifted agent, and hard-working

employee, who your Division believes will never again engage in misconduct." Compl. ¶ 35. But the day after AD Will accepted the Last Chance Agreement and issued the "final" disciplinary action, Deputy Director David Bowdich ("DD Bowdich") reversed it, and mandated that Special Agent Strzok be fired, effective immediately, and without the right to a Disciplinary Review Board appeal promised by the FBI adverse action procedures. Compl. ¶¶ 3, 37.

Discovery has shown that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. A, Defendants' Resp. to Strzok Interrogatory No. 5. Discovery has also confirmed that the FBI applied those policies disparately: firing Strzok for expressing political opinions critical of then-President Trump, but issuing minor discipline (or none at all) to agents who praised Trump or criticized his political opponents on their FBI-issued devices. *See* Office of the Inspector Gen., U.S. Dep't of Justice, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* at 339 n.477, Oversight and Review Division 20-012 (Dec. 2019 (Revised)), https://www.justice.gov/storage/120919-examination.pdf; Scott R. Anderson, & Benjamin Wittes, *Newly Released FBI Documents Show Troubling Double Standard on Political Speech*, LAWFARE (Oct. 31, 2020, 3:51 PM), https://www.lawfareblog.com/newly-released-fbi-documents-show-troubling-double-standard-political-speech. This was a content-based distinction, rewarding supporters and punishing critics.

DD Bowdich's decision came amidst a blizzard of public statements and tweets in which the former President (and his staff) excoriated Strzok. The totality of these public statements is too numerous to list here, but it is remarkable for its volume and length. Former President Trump has mentioned Strzok numerous times over the last four years in interviews with The Wall Street Journal, ABC, CBS, Fox News, and Sinclair Broadcasting, to the White House Press Corps, at

graduation ceremonies, while standing next to Vladimir Putin, at campaign rallies, while greeting troops for the holidays via videoconference, and on Twitter – before his account was suspended – more than 70 times.  A representative sample includes:

- "This is the FBI we're talking about—that is treason. That is a treasonous act. What he tweeted to his lover is a treasonous act." Rebecca Ballhaus, *Trump Accuses FBI Agent of 'Treason'*, Wall St. J. (Jan. 11, 2018), https://www.wsj.com/articles/trump-accuses-fbi-agent-of-treason-1515710206.

- "Lisa Page, who may hold the record for the most Emails in the shortest period of time (to her Lover, Peter S), and attorney Baker, are out at the FBI as part of the Probers getting caught? Why is Peter S still there? What a total mess. Our Country has to get back to Business!" Donald J. Trump (@realDonaldTrump), Twitter (May 7, 2018, 6:29 AM).

- "I'll tell you what — you're asking me about Peter Strzok being fired.  I am amazed that Peter Strzok is still at the FBI, and so is everybody else that read that report. . . . Peter Strzok should have been fired a long time ago, and others should have been fired." Donald J. Trump, *Remarks by President Trump in Press Gaggle*, National Archives (June 15, 2018), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-press-gaggle/.

- "How can the Rigged Witch Hunt proceed when it was started, influenced and worked on, for an extended period of time, by former FBI Agent/Lover Peter Strzok?" Donald J. Trump (@realDonaldTrump), Twitter (July 11, 2018, 3:47 PM).

- "He should never, ever been allowed to remain in the FBI while he himself was being investigated."  Donald J. Trump (@realDonaldTrump), Twitter (Aug. 1, 2018, 6:03 AM) (Retweeting Alan Dershowitz).

- "Agent Peter Strzok was just fired from the FBI - finally. The list of bad players in the FBI & DOJ gets longer & longer. Based on the fact that Strzok was in charge of the Witch Hunt, will it be dropped? It is a total Hoax. No Collusion, No Obstruction - I just fight back!  Donald J. Trump (@realDonaldTrump), Twitter (Aug. 13, 2018, 9:04 AM).

Contemporaneous news reports also chronicled efforts by then President Trump to directly pressure Attorney General Sessions and FBI Director Wray to fire Strzok:

> President Donald Trump sharply questioned Attorney General Jeff Sessions and FBI Director Christopher Wray during a White House meeting on January 22 about why two senior FBI officials — Peter Strzok and Lisa Page — were still in their jobs despite allegations

>made by allies of the [P]resident that they had been disloyal to him and had unfairly targeted him and his administration, according to two people with knowledge of the matter. The president also pressed his attorney general and FBI director to work more aggressively to uncover derogatory information within the FBI's files to turn over to congressional Republicans working to discredit the two FBI officials, according to the same sources. The very next day, Trump met Sessions again, this time without Wray present, and even more aggressively advocated that Strzok and Page be fired, the sources said.

Murray Waas, *Exclusive: Trump Pressed Sessions to Fire 2 FBI Officials Who Sent Anti-Trump Text Messages* VOX (April 20, 2018), https://www.vox.com/2018/4/20/17258230/trump-sessions-fire-fbi-officials-strzok-page-text-messages.  DD Bowdich reported to Director Wray (one of the officials "sharply questioned" by the President about Strzok's status), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Ex. B, FBI-Strzok-0003098 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

Count One of the Complaint contends that DD Bowdich caved to the unrelenting pressure from the President and fired Mr. Strzok for his political speech in violation of his rights under the First Amendment.  Public statements from former President Trump after Strzok's firing support the conclusion that this is exactly what happened.  Trump has repeatedly made statements in which he appears to claim credit for Strzok's firing.  Roughly a year after Strzok was fired, President Trump declared, "[W]hat they did to General Flynn is very unfair . . . .  And now we found out they're a bunch of dirty cops. . . .  [T]hey did a phony dossier; they used the dossier for FISA . . . These were bad people.  These were evil people.  And I hope that someday *I'm going to consider it my greatest -- or one of my greatest achievements -- getting rid of them.*" *Donald Trump Greets Troops Via Videoconference for the Holidays*, YouTube (Dec. 24, 2019), https://www.youtube.com/watch?v=w5gLkU-Zz7A (emphasis supplied, recording at 26:25).  Even while representing our nation abroad, Trump went out of his way to claim credit for these

5

firings: "*I consider what I've done here with this whole witch hunt from day one — with the insurance policy, with the horrible statements made between Strzok and Page* and McCabe and Comey, who lied to Congress and did so many other bad things. He lied and he leaked.  When I finish, *I think that this is going to go down as one of the greatest things I've done for our country.*" Donald Trump Holds a Press Conference Before Leaving Davos, YouTube (Jan. 22, 2020), https://www.youtube.com/watch?v=xj4uCDNmg9Q (emphasis supplied, recoding at 39:30).  Most recently, Mr. Trump declared on Fox News "*But I fired Comey, that whole group*, and now that group is coming back again?  I mean, it's not believable, it shouldn't be allowed to happen." Life Liberty Levin, Fox News (Dec. 5, 2021, 5:31 PM), https://archive.org/details/FOXNEWSW_20211206_010000_Life_Liberty__Levin  (emphasis supplied).

Count Three of the Complaint alleges that the Defendants violated the Privacy Act through their unprecedented December 12, 2017 disclosure to the news media of texts between Special Agent Strzok and Lisa Page, as well as Defendants' earlier leaks of the existence and content of those texts.  Then-President Trump's barrage of public statements is also relevant to Mr. Strzok's damages under his Privacy Act claim, as Mr. Trump amplified the harm that Plaintiff and his family experienced because of the unlawful disclosures.  Among the more repugnant displays of Presidential abuse, Mr. Trump mimicked an orgasm while describing some of the texts released to the media at his public rallies.  Plaintiff therefore intends to question Mr. Trump not only about his effort to have Mr. Strzok fired, his motives for that campaign, and the credit he has taken for its success, but also about the links between his disgraceful assault on Mr. Strzok's private life while campaigning for reelection and the Department of Justice's unlawful disclosures.

Although Attorney Lawrence Rosen accepted service of the initial subpoena on behalf of former President Trump in November, he maintained that his representation of Trump went no further with respect to this matter. *See* Ex. C. The Department – and Trump's team – have made it exceedingly difficult for Strzok to take the most basic logistical steps to line up Mr. Trump's deposition, refusing for months to reveal who represents Mr. Trump and erecting obstacles to confirmation of service. *See, e.g.*, Ex. D, E.[2] A mere three days before the deposition was scheduled to take place (and after it was delayed twice), the Department of Justice informed counsel for Mr. Strzok that they intended to file the Motion. *See* Ex. E.

## ARGUMENT

Generally speaking, "[a] party is entitled to depose a witness on all relevant issues to which the witness has knowledge." *CBS, Inc. v. Ahern,* 102 F.R.D. 820, 822 (S.D.N.Y. 1984). The party seeking a protective order must make "a specific demonstration of facts to support their request for the protective order and may not rely on conclusory or speculative statements concerning the need for a protective order. Specifically, good cause exists under Rule 26(c) when justice requires the protection of a party or a person from any annoyance, embarrassment, oppression, or undue burden or expense. Moreover, the showing required under Rule 26(c) must be sufficient to overcome plaintiffs' legitimate and important interests in trial preparation." *Alexander v. F.B.I.*, 186 F.R.D. 1, 3 (D.D.C. 1998) ("[T]rial preparation and defense ... are important interests, and great care must be taken to avoid their unnecessary infringement." (quoting *Farnsworth v. Procter*

---

[2] These efforts paralleled attempts to stall depositions of other former senior government officials, including DD Bowdich, whom the government suggests Plaintiff should depose before Mr. Trump. Motion at 9. For months, Defendants refused to provide DD Bowdich's address as required by Rule 26(a)(1)(A)(i). The DOJ and FBI claimed – remarkably – not to know it. Defendants identified Mr. Bowdich's counsel only after Mr. Strzok paid for two unsuccessful attempts to serve Mr. Bowdich at the best address he could find and threatened to move to compel pursuant to Rule 26. *See* Ex. F.

*& Gamble Co.,* 758 F.2d 1545, 1547 (11th Cir.1985))). As the party seeking protection under Rule 26(c), it is the government's burden to carry. *Id.*

But Defendants here seek to flip that burden onto Peter Strzok, citing a number of inapposite cases in which courts emphasize the need to protect high-level government officials from being deposed merely because they were the captain of the ship, reviewing or approving decisions made by subordinates. Mr. Trump's deposition is not being sought merely because he was the "captain of the ship," but because his own conduct and state of mind are directly at issue.

Defendants' authority misses the point. In *Peoples v. U.S. Department of Agriculture*, 427 F.2d 561, 567 (D.C. Cir. 1970), for example, the claims involved a challenge to the Department of Agriculture regarding the prices applied to food stamp recipients before becoming eligible for additional benefits. There was no assertion that the Secretary's motive or intent was at issue in the case, or that he had direct responsibility for the decision at issue, and the D.C. Circuit noted that "subjecting a cabinet officer to oral deposition is not normally countenanced" and certainly not justified under those circumstances. The same was true for *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008), where the plaintiffs sought to depose David Addison, Chief of Staff to Vice President Cheney, over a claim that records from that office had been improperly destroyed. The appellate court, which issued a writ of mandamus overturning the district court's discovery order, noted that Addison had "no apparent involvement" at all in the claim at issue, and that there were lower-level staff who plainly did and who could be substituted in for his deposition. *Id.*

Where, in contrast, there is sufficient basis to believe that a high-ranking government or corporate executive does have personal knowledge of facts central to the claims in the case, courts do not hesitate to permit depositions. As the Court of Appeals for the Second Circuit has formulated the test, "to depose a high-ranking government official, a party must demonstrate

exceptional circumstances justifying the deposition -- for example, that the official has unique first-hand knowledge related to the litigated claims *or* that the necessary information cannot be obtained through other, less burdensome or intrusive means." *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) (emphasis added). And when a court finds that the relevant government official "has unique first-hand knowledge related to the litigated claims, *it need not make a separate finding that the necessary information cannot be obtained through other, less burdensome or intrusive means.*" *In re Terrorist Attacks on Sept. 11, 2001*, Case No. 03-MDL-01570 (GBD)(SN), 2020 WL 8611024, at *14 (S.D.N.Y. Aug. 27, 2020) (emphasis added) (quoting *New York v. United States Dep't of Commerce*, 339 F. Supp. 3d 144, 151 (S.D.N.Y. Sept. 7, 2018)).

*In Re Terrorist Attacks* involved a claim seeking compensation for injuries suffered from the 9/11 attacks pursuant to the Justice Against State Sponsors of Terrorism Act ("JASTA"). The depositions at issue concerned high-level Saudi Arabian officials, including Prince Bandar, the former Saudi Ambassador, who oversaw the work of embassy employees believed to have provided assistance to some of the hijackers. The defendants argued that there was insufficient showing that Prince Bandar had unique personal knowledge relevant to the case to justify his deposition under "apex" principles. Applying *Lederman*, the district court disagreed and permitted the deposition:

> Prince Bandar likely has first-hand knowledge, as the Ambassador at the time these events transpired, into the role that Al Thumairy was assigned by the Kingdom and the diplomatic cover provided to the propagators. Accordingly, Plaintiffs have met their required burden under *Lederman* as applied by the Court to former officials to show "exceptional circumstances" justifying Prince Bandar's deposition.

9

*Id.* Having determined that the plaintiffs had met their burden of establishing the potential deponent's unique personal knowledge, the Court did *not* require an additional showing that all other methods of obtaining the discoverable information had been exhausted.

Here, the evidence in the public record justifying former President Trump's deposition is far more convincing than the demonstration supporting the deposition in *In Re Terrorist Attacks*. First, it is entirely proper to question Mr. Trump about whether he met with and directly pressured FBI and DOJ officials to fire Plaintiff (as reported in contemporaneous news accounts), and whether he directed any White House staff to engage in similar efforts. He has unique personal knowledge regarding his own actions in this regard. Second, he has made repeated public statements in which he appears to be claiming credit for firing Strzok, for example by including him in a list of FBI officials whom he believes to have betrayed him and boasting about having "gotten rid" of them all. To the extent that there is any ambiguity about what he meant by those statements, or precisely whose firing he was crowing about, Plaintiff should be permitted to question Mr. Trump about them. There is no one else who can reasonably be expected to answer those questions under oath without speculating. Third, there is no dispute that President Trump issued a firestorm of tweets berating Strzok before the firing decision. He is the only person who can testify directly about his state of mind when he wrote them, and what he intended to accomplish by sending them. And finally, it is appropriate to question Mr. Trump about what appears to have been a conscious plan to inflict the maximum damage possible on Special Agent Strzok from the startling decision of the DOJ to release the texts to the news media. The existence and degree of malice he harbored during his juvenile public reenactments and comments is relevant to the question of damages under the Privacy Act claim.

Defendants assert that the Complaint does not allege that Mr. Trump was "the decision maker who caused the release of the texts or the termination of Mr. Strzok's employment." Motion at 3. This is hardly accurate. The Complaint alleges that someone at the White House was used as a conduit to leak information about the texts to the press before December 2, 2017, before the Department illegally produced the text messages directly to the media on December 12. Compl. ¶ 59. And the Complaint repeatedly alleges that Mr. Trump was the creator and prime mover (in other words, the cause) of the demonization campaign that led to Strzok's termination. Compl. ¶¶ 44-49.

The fact that then President Trump was not the formal "deciding official" on the firing decision does not make this inquiry any less relevant. If a jury determines that then President Trump acted with retaliatory animus toward Strzok, and that his pressure campaign influenced Deputy Director Bowdich to overturn the lesser discipline and fire Strzok, then Plaintiff will have prevailed on his First Amendment retaliation claim. As the Supreme Court has explained, an employer is still liable for discrimination even when the ultimate decisionmaker is merely influenced by the biased actions of another, so long as the influence was a proximate cause of the adverse action:

> [I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. . . . We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decisionmaker's exercise of judgment is also a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes.

*Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011); *see also Steele v. Mattis*, 899 F.3d 943, 950 (D.C. Cir. 2018) ("The actions of a discriminatory supervisor that feed into and causally influence

11

the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action.").

The Second Circuit has also adopted this approach to proving unlawful intent in employment claims: "[P]ermitting 'cat's paw' recovery in retaliation cases accords with longstanding precedent in our Court, in the employment-discrimination context, that 'a Title VII plaintiff is entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decisionmaking] process.'" *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016). Here, of course, the influencing official was the President of the United States, who not only oversees all executive agencies but who had also recently fired two Directors of the FBI whom he perceived to be disloyal to him. The inference that Deputy Director Bowdich might be influenced by the President's pressure campaign under these conditions is not only plausible, but highly probable.[3]

Only Donald Trump can testify directly about his motivations for his actions regarding Strzok, and his state of mind is a central issue in this case. Even if Plaintiff first deposed other officials, such as Mr. Bowdich, or FBI Director Wray, they would at most be able to testify about what he said, not what he intended when he said it. Only President Trump can testify as to precisely why he acted as he did. In comparable circumstances, where the proposed witness's motive and intent are at issue, district court judges in the District of Columbia have also greenlighted the depositions. For example, in *Zimmerman v. Al Jazeera Am., LLC*, 329 F.R.D. 1, 6 (D.D.C. 2018),

---

[3] As further explained below, even if Mr. Bowdich testifies that he was not influenced by President Trump's ruthless campaign against Mr. Strzok or Mr. Trump's established penchant for purging government employees who refused to kowtow to his demands, the jury would be entitled to evaluate the credibility of that denial, including by weighing it against the evidence to the contrary, such as Mr. Trump's statements. *See* Fed. R. Evid. 401; Fed. R. Civ. P. 26(b)(1).

a defamation action by baseball players challenging a film implicating them in the use of performance enhancing steroids, the district court approved the deposition of the Acting Director General of Al Jazeera Media Network over "apex doctrine" objections by the defense. The Court noted that his motive in approving of the story, and whether he adhered or deviated from editorial standards in doing so, "would be relevant to determining whether Al Jazeera acted with actual malice," and the deposition was justified even when lower-level employees could have testified about the editorial standards at issue. Similarly, in *Judicial Watch v. U.S. Dep't of State*, No. CV 13-1363, 2016 WL 10770466, at *3 (D.D.C. Aug. 19, 2016), Judge Sullivan authorized the deposition of then Secretary of State Hillary Clinton to testify about her reasons for using a private server to send and receive State Department emails, because her subordinates were not able to shed light on her motivation for her actions. *See also Trump Old Post Office LLC v. Topo Atrio LLC*, No. 2015 CA 006624 B, 2016 WL 11478086 (D.C. Super. Dec. 14, 2016) (ordering Trump's deposition over apex doctrine objections).

Moreover, few if any of the underlying reasons for the existence of the "apex doctrine" have persuasive force here. The three goals of the doctrine are "(1) to protect the integrity and independence of the government's decision-making processes, (2) to permit high-ranking government officials to perform their tasks without disruption or diversion, and (3) to limit indiscriminate depositions that would discourage individuals from accepting positions as public servants." *U.S. v. Newman*, 531 F.Supp. 3d 181, 188 (D.D.C. 2021). Here, of course, it was former President Trump who showed no regard for the integrity and independence of the FBI's disciplinary decision-making process; he publicly sought to interfere with it, so questioning him about his actions hardly threatens that process.

Factor two is, as the government concedes, no longer in play with Mr. Trump out of office. Motion at 6; *see also*, *Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 252 (S.D.N.Y. 2015) ("[T]he fact that [a proposed deponent is] not [a] current high-ranking official[ ] is a factor when considering whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties."). The time devoted to the deposition might interfere with Mr. Trump's golf game or speaking at rallies falsely claiming that he won the 2020 Presidential election, but would not distract him from the performance of any official public duties. Indeed, the argument that instead of private citizen Trump, Plaintiff should first be required to depose current FBI Director Wray about some of these topics undermines the very principle that the government purports to advance. The Defendants' citation, Motion at 6, of the *Poindexter* court's statement that "[h]istory records less than a dozen instances of testimony of Presidents of the United States" is particularly rich, as if Mr. Trump were a normal President and former President who should be shielded by the norms of an office that he has spent the last six years shredding.

Defendants rely heavily on *Kelley,* a case in which the Court applied the "apex doctrine" to defer the deposition of Jeh Johnson, who at the time of the litigation was the Secretary of Homeland Security. But the circumstances at issue in *Kelley* were far different than those here. In addition to the fact that at the time of the deposition, Mr. Johnson held a cabinet level position, and the Court noted that there was no compelling evidence that he had been the source of the leak claimed to have violated the Privacy Act:

> The mere fact that Johnson, who by that time was the former General Counsel of the Department, responded to questions on the record in connection with the Tampa Tribune article does not give rise to any reason to believe that he was the source of the previous unauthorized and unattributed leaks. The interview with the Tribune reporter was conducted eight months after the disclosures this lawsuit is seeking

14

>to probe, and it was prompted by the fact that a member of the House Armed Services Committee had publicly called for the investigation into General Allen to be re-opened. Johnson simply informed the reporter that his review of the material indicated that such a step would be unnecessary, and he cast no needless aspersions on the Kelleys. This single interview hardly supports plaintiffs' contention that Secretary Johnson "has a demonstrated propensity to speak with journalists about the Kelley records." Pls.' Opp. at 4.
>
>Plaintiffs do not point to any other facts that would suggest that the source who leaked Mrs. Kelley's identity was the General Counsel of the Department of Defense. Basically, they just want to ask him.

*Kelley*, 2015 WL 13648073, at *3. *Kelley*, of course, is nothing like the situation here, where former President Trump has repeatedly implicated himself in the allegedly unlawful firing decision challenged in this case.

Defendants nod toward the possibility that the deposition of Mr. Trump will never be justified, speculating, Motion at 4, that officials like Deputy Director Bowdich and Director Wray will testify that "despite being aware" of Trump's demands that Mr. Strzok be fired, "they weren't influenced," as if the incantation of that mantra would somehow end the inquiry and Mr. Strzok would have to accept, without deposing Mr. Trump himself, the implausible conclusion that a vendetta by the President of the United States had nothing to do with his firing. Any argument that the deposition of Donald Trump won't be justified *at any time* in this case borders on the frivolous. After all, "the complete prohibition of a deposition is an 'extraordinary measure[ ] which should be resorted to only in rare occasions.'" *Alexander*, 186 F.R.D. at 75 ("It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." (quoting *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979))). Rather, the focus of Defendants' objection seems to be more about the timing and order of the deposition, than whether it should ever take place, and they repeatedly claim that Plaintiffs have not taken or noticed any other depositions in the case. Motion at 10.

15

First, the government is incorrect. The two plaintiffs (Strzok and Lisa Page), whose cases have been consolidated for purposes of discovery, identified a first round of deponents in November 2021 and have already taken two of those depositions. Unfortunately, Plaintiffs' efforts to take additional deposition have been repeatedly delayed pending completion of document production.[4] Plaintiff proposes only to question Mr. Trump about *his* actions and *his* decisions at issue in this case. There is no reason why Plaintiff should be forced to wait the many months, if not years, it might take to complete all other avenues of discovery in this case, before obtaining the testimony of a key seventy-five-year-old witness about events that are already more than three years old.

Second, the government's objection is more than a bit disingenuous. Plaintiff issued his first discovery requests on November 1, *2020*. Defendants have repeatedly asked for long extensions to respond, and the FBI did not identify the custodians and search terms it would use to identify potentially responsive information until almost a year later on October 21, 2021. The DOJ recently requested a delay of Michael Horowitz's deposition in light of more than a thousand relevant documents related to him that had not been produced.[5] Defendants' proper production of responsive documents is necessary to effective deposition of their current and former employees.[6] Their inability or unwillingness to produce documents in a timely manner should not be heard as

---

[4] Plaintiffs issued a subpoena for the deposition of David Bowdich, who has retired from the FBI, in July 2021. That deposition was delayed for many months because defendants refused to provide his home address, which would have aided the simple act of serving him with a subpoena to compel his testimony.

[5] The FBI has produced more than 25,000 pages of discovery in the last week, and approximately 33,000 pages of discovery (80+ percent of its total) since February 25, 2022. The Office of the Inspector General has also produced approximately 10,000 pages of discovery in the last week.

[6] The parties are working to address significant problems with the Defendants' most recent productions, including hundreds of pages of unexplained redactions and tens of thousands of pages that are not text searchable.

a justification to stall critical discovery from another source that the plaintiffs are ready and entitled to take.

"Presidents are not kings, and [Mr. Trump] is not President." *Trump v. Thompson*, No. 21-CV-2769 (TSC), 2021 WL 5218398, at *8 (D.D.C. Nov. 9, 2021), *aff'd*, 20 F.4th 10 (D.C. Cir. 2021) (bracket supplied).  Presidents and former Presidents are not immune from deposition, or other legal process, when they have unique knowledge relevant to a viable legal claim.  In *Halperin v. Kissinger*, 401 F. Supp. 272, 273 (D.D.C. 1975), former President Nixon was compelled to give a deposition after he gave public statements indicating that he had unique personal knowledge of the reasons behind the wiretapping of the plaintiff at issue in the case: "Mr. Nixon, the government official allegedly responsible for the wiretap program, is uniquely capable of clarifying certain of these issues." *Id*. at 274-75.  And of course, then current President Clinton was required to defend a civil lawsuit in which he had unique personal knowledge of the alleged claims.  The Supreme Court held that the district court's order staying the case until after his term expired was an abuse of discretion: "Such a lengthy and categorical stay takes no account whatever of the respondent's interest in bringing the case to trial. . . delaying trial would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party." *Clinton v. Jones*, 520 U.S. 681, 707–08 (1997).  In sum, former President Trump unquestionably has personal knowledge that is relevant to the claims advanced in this case.  Indeed, he seems to have gleefully accepted responsibility for firing Pete Strzok. There is no reason to prohibit or delay his deposition.

## CONCLUSION

The Court should deny Defendants' Motion to Quash or for a Protective Order.

Dated:  March 8, 2022                               Respectfully submitted,

                                                    /s/ Aitan D. Goelman
                                                    Aitan D. Goelman (D.C. Bar No. 446636)
                                                    Christopher R. MacColl (D.C. Bar No. 1049153)
                                                    ZUCKERMAN SPAEDER LLP
                                                    1800 M Street NW, Suite 1000
                                                    Washington, DC 20036
                                                    Telephone: (202) 778-1800
                                                    AGoelman@zuckerman.com

                                                    /s/ Richard A. Salzman
                                                    Richard A. Salzman (D.C. Bar No. 422497)
                                                    HELLER, HURON, CHERTKOF & SALZMAN PLLC
                                                    1730 M Street NW, Suite 412
                                                    Washington, DC 20036
                                                    Telephone: (202) 293-8090
                                                    salzman@hellerhuron.com

                                                    *Counsel for Plaintiff Peter Strzok*