# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER P. STRZOK, <br><br> Plaintiff, <br><br> v. <br><br> ATTORNEY GENERAL MERRICK B. GARLAND, in his official capacity, *et al.*, <br><br> Defendants. | Civil Action No. 19-2367 (ABJ) |
| LISA PAGE, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, *et al.*, <br><br> Defendants. | Civil Action No. 19-3675 (TSC) |
| ATTORNEY GENERAL MERRICK GARLAND, in his official capacity, UNITED STATES DEPARTMENT OF JUSTICE, FBI DIRECTOR CHRISTOPHER A. WRAY, in his official capacity, FEDERAL BUREAU OF INVESTIGATION, <br><br> Movants, <br> v. <br><br> PETER P. STRZOK <br><br> IN RE SUBPOENA SERVED ON DONALD J. TRUMP | Case No.: 1:22-mc-27 (ABJ) |

**DEFENDANTS' LEGAL ARGUMENTS REGARDING PRIVILEGE ISSUES BEARING ON DEPOSITIONS AT ISSUE IN MOTIONS TO QUASH**

Defendants submit this memorandum pursuant to the Court's August 10, 2022 Minute Order, setting out their legal arguments regarding the privilege issues bearing on the proposed depositions of former President Trump and Director Wray.

Defendants respectfully reiterate at the outset that neither proposed deposition should go forward at all, for the reasons explained in Defendants' briefs in support of their motions to quash. Following the parties' briefing and the August 10, 2022 hearing on those motions, the Court ordered the parties to file supplemental pleadings "addressing whether and how any information gathered in [the] depositions [of former Deputy Attorney General Rod Rosenstein and former FBI Deputy Director David Bowdich] bears upon the resolution of the apex doctrine issue raised in the motions to quash." Minute Order (Aug. 10, 2022). In his filing, Mr. Strzok identified nothing in the testimony of Mr. Rosenstein or Mr. Bowdich to justify a deposition of either former President Trump or Director Wray. To the contrary, the deposition testimony reinforces the conclusion that Mr. Strzok has not met his heavy burden to depose those high-level officials. *See generally* Defs.' Suppl. Filing in Supp. of Mots. to Quash Subpoenas and for Protective Order, ECF No. 90 ("Defs.' Suppl. Filing"). Accordingly, and especially when considered in the context of the narrow scope of Mr. Strzok's claims and the extensive testimony and written discovery provided to Mr. Strzok already in this litigation, the Court should grant the government's motions to quash, and the Court need not reach the privilege issues addressed herein.

If the Court were to determine, however, that Mr. Strzok had made the showing required by the "apex doctrine" to depose former President Trump or Director Wray, the Court should allow either or both of the depositions to go forward only with the understanding that the government may instruct the witness(es) not to divulge information potentially subject to the Presidential

1

Communications Privilege or the Deliberative Process Privilege. As required by the Court's August 10 Minute Order, Defendants endeavored in their October 18 filing to inform the Court as to the specific questions—among those questions included in Mr. Strzok's September 29 Notice—to which Defendants would object and instruct the witness not to answer based on either or both of those privileges. That is true even though, as discussed in that filing and below, perfection of the Presidential Communications Privilege would require consultation with the sitting President, which should be required, if ever, only in the context of a motion to compel specific deposition testimony and after the Court has ruled on Defendants' motions to quash.

Even so, the Court has sufficient information to determine that, if either deposition were allowed to proceed, Defendants could properly object to prevent testimony on certain topics identified by Mr. Strzok to permit such privilege assessments, because Mr. Strzok seeks testimony regarding nonpublic conversations involving former President Trump and his close advisors in the context of presidential decisionmaking. Moreover, Mr. Strzok cannot come close to making the focused demonstration of need required to overcome the privilege given that former President Trump was not the decisionmaker regarding any of the events that form the basis of Mr. Strzok's claims, the lack of any evidence suggesting the former President influenced the actual decisionmaker, and the widespread public knowledge of the former President's views regarding Mr. Strzok.

Finally, the government has been exceedingly sparing in asserting the Deliberative Process Privilege throughout discovery, doing so only to protect information that is so far afield from Plaintiffs' claims that there could be no legitimate claim of need. The few questions to which the government indicated it would assert the Deliberative Process Privilege during any deposition of former President Trump or Director Wray are limited to such remote lines of inquiry.

## BACKGROUND

Mr. Strzok filed suit against Defendants in 2019 asserting claims related to the December 2017 disclosure to the press of text messages he exchanged with Lisa Page, and to Mr. Strzok's removal from the FBI by then-Deputy Director David Bowdich. Discovery has been extensive and is ongoing. The government began producing documents in February 2021, and Defendants have produced over 95,000 pages of documents to date.

In addition, Mr. Strzok has deposed the following eight fact witnesses: Sarah Isgur (formerly Sarah Flores), the Department's former Director of Public Affairs; Peter Winn, the Department's Acting Chief Privacy and Civil Liberties Officer; Scott Schools, a former Associate Deputy Attorney General; Rod Rosenstein, the former Deputy Attorney General; Michael Horowitz, the Department's Inspector General; Candice Will, the former Assistant Director of the FBI's Office of Professional Responsibility; Nancy McNamara, the former Assistant Director of FBI's Inspection Division; and former FBI Deputy Director Bowdich. Mr. Strzok has also subpoenaed for deposition Zachary Harmon, who was Director Wray's Chief of Staff during the relevant period, though that deposition has not yet been scheduled.

Besides party discovery, Ms. Isgur, Mr. Winn, Mr. Schools, Mr. Rosenstein, and Mr. Bowdich, as well as Stephen Boyd, the former Assistant Attorney General for Legislative Affairs, have responded to third-party subpoenas requesting documents in their personal possession, custody, or control. Further, after receiving the Court's approval, Mr. Strzok also served a subpoena on the National Archives and Records Administration ("NARA"), which completed its production of responsive materials on September 23, 2022.

As relevant here, and as discussed further below, despite the extensive fact gathering that has already occurred in this case, Mr. Strzok has not elicited any evidence either that former

President Trump had any involvement or influence on the Department's decision to release the text messages on December 12, 2017, or that the former President influenced, directly or indirectly, Mr. Bowdich's decision to remove Mr. Strzok from the rolls of the FBI.

Nevertheless, Mr. Strzok contends that it would not be proper for the government to invoke the Presidential Communications Privilege to prevent testimony that would reveal the substance of communications with the President in response to questions his counsel would ask during a deposition. *See, e.g.*, Pl.'s Opp'n to Defs.' Mot. to Quash at 13–17 ("Strzok's Opp'n to Mot. to Quash"), ECF No. 78. Defendants disagree and, pursuant to this Court's August 10 Minute Order, have described—from among the "topics and questions" identified in Mr. Strzok's September 29 Notice—where they anticipate objecting in order to preserve the Presidential Communications Privilege or the Deliberative Process Privilege in a deposition of former President Trump and/or Director Wray, if either were permitted. *See* Defs.' Resp. to Mr. Strzok's Notice Listing Areas of Inquiry for Depositions, ECF No. 95.

## ARGUMENT

**I.   Defendants' Anticipated Objections to Questions Based on the Presidential Communications Privilege Are Well-Taken.**

**A.   The Presidential Communications Privilege**

The Presidential Communications Privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (describing the privilege's "constitutional origins"). The privilege is broad, protecting the "confidentiality of Presidential communications in performance of the President's responsibilities[,]" *Nixon*, 418 U.S. at 711, as well as "documents or other materials that reflect presidential decisionmaking and deliberations[,]" *In re Sealed Case*, 121 F.3d at 744. The privilege

4

also extends to communications authored or solicited and received by immediate White House advisors in the Executive Office of the President and their staff related to presidential decision-making. *See id.* at 754.

Courts must be mindful of the "special considerations" affecting separation of powers that control when "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Am. Historical Ass'n v. Nat'l Archives and Records Admin.*, 402 F. Supp. 2d 171, 182 (D.D.C. 2005) (quotation omitted); *see also Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 382 (2004) ("We have, in short, long recognized the 'unique position in the constitutional scheme' that [the Executive Office of the President] occupies.") (citation omitted); *id.* at 385 ("The Court has held, on more than one occasion, that '[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery,' . . . and that the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' . . . .") (citation omitted); *In re Sealed Case*, 121 F.3d at 750 ("If presidential advisers must assume they will be held to account publicly for all approaches that were advanced, considered but ultimately rejected, they will almost inevitably be inclined to avoid serious consideration of novel or controversial approaches to presidential problems.").

The D.C. Circuit has contrasted the Presidential Communications Privilege with the Deliberative Process Privilege in order to demonstrate the former's broader nature and scope. "[C]ongressional or judicial negation of the presidential communications privilege is subject to greater scrutiny than denial of the deliberative process privilege." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (alterations omitted). For example, there is no duty to

segregate information protected by the Presidential Communication Privilege from information that is not privileged. *Id.* at 887. In addition, "whereas the deliberative process privilege covers only pre-decisional and deliberative material," the presidential communications privilege also covers "post-decisional and factual material[.]" *Id.* at 885–86.

Finally, the D.C. Circuit has instructed that, because the Presidential Communications Privilege is "more difficult to surmount" than the Deliberative Process Privilege, "a party seeking to overcome the presidential privilege seemingly must always provide a focused demonstration of need." *In re Sealed* Case, 121 F.3d at 746. That is true even where "there are allegations of misconduct by high-level officials." *Id.*

> **B.     Defendants May Properly Prevent Testimony Regarding the Presidential Communications About Which Mr. Strzok Seeks to Inquire and to Which Defendants Have Indicated They Would Object.**

In their October 18 filing, Defendants endeavored to inform the Court as to the specific questions to which Defendants would object and instruct not to answer with respect to the Presidential Communications Privilege. Defendants explained that in the ordinary course, the sitting President would not be called on to perfect privilege assertions under the Presidential Communications Privilege during a deposition. Rather, if testimony that would potentially elicit covered presidential communications were called for during a deposition, in light of any specific question asked by the taking attorney, the defending government attorney would instruct the witness not to answer, to the extent doing so would reveal privileged information, to protect the President's ability to perfect privilege in the event that the taking party were to move to compel. *See* Defs.' Resp. to Strzok's September 29, 2022 Notice ("Defs.' Oct. 18 Filing") at 1–2, ECF No. 94; *see also Alexander v. FBI*, 186 F.R.D. 128, 136 (D.D.C. 1998); *see also In re Sealed Case*, 121 F.3d. at 741 (explaining that "the White House [did not] have an obligation to formally invoke its privileges in advance of the motion to compel," which was "the first event which could have forced

disclosure").

This approach is consistent with the "unique position in the constitutional scheme" that the President occupies. *Cheney*, 542 U.S. at 382. Indeed, the Court should not require the sitting President to perfect privilege here unless and until all other objections to the scope of discovery are resolved—*i.e.*, until after the Court rules on the motions to quash. *See id.* at 389 (explaining that where the government has objected to the scope of discovery and asked the district court to narrow, those objections should be resolved before the President is put "to the burden that would arise from the District Court's insistence that the [defendants] winnow the discovery orders by asserting specific claims of privilege"). As the Supreme Court explained in *Cheney*, "[e]xecutive privilege is an extraordinary assertion of power 'not to be lightly invoked,'" and the need to resolve such questions therefore "should be avoided whenever possible."[1] *Id.* at 389–90 (citation omitted).

In attempting to comply with the special procedure the Court instituted to evaluate claims of privilege in the context of deciding the motions to quash, Defendants explained that they would anticipate instructing the former President and/or Mr. Wray not to answer questions Mr. Strzok proposes to ask about nonpublic conversations of former President Trump with his close advisors on a narrow set of topics involving potential presidential decisionmaking. Such communications unquestionably fall within the ambit of the privilege. *See, e.g.*, *Protect Democracy Project*, 10 F.4th at 886 ("Records of what was said by or directly to the President lie at the heart of the presidential communications privilege."). The presidential meetings, about which Mr. Strzok

---

[1] As discussed in previous briefing, one purpose of the apex doctrine is "to permit high-ranking government officials to perform their tasks without disruption or diversion." *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021). Although this factor may have less applicability to former officials in some cases, where Plaintiff has proposed topics that implicate the Presidential Communications Privilege, and a deposition may thus require a burden on the current President should he be required to perfect the privilege, it is an additional reason supporting quashing the subpoena.

proposes to ask questions regarding the substance of presidential communications, and nonpublic communications with officials at DOJ and the FBI, include subjects that could implicate presidential decisionmaking—according to Mr. Strzok's own telling—such as the retention and recovery text messages relevant to an ongoing OIG investigation and a briefing on an OIG report on the handling of the FBI's Midyear investigation. *See* Pl.'s Sept. 29, 2022 Notice at 1, 3, ECF No. 89. There is a strong public interest in maintaining confidentiality of these and similar presidential discussions regarding oversight of Executive Branch agencies. That is true, and the communications during those meetings are presumptively privileged, even if they also allegedly included some topics that ultimately did not involve presidential decisionmaking, *Protect Democracy Project*, 10 F.4th at 887–88, and even in the face of allegations of misconduct, *In re Sealed Case*, 121 F.3d at 746, 751.

Mr. Strzok's attempt to characterize any communications regarding his text messages as a mere "personnel action," Strzok's Opp'n to Mot. to Quash at 15, ignores the context in which the text messages were exchanged. As reflected in the report published by the OIG in June 2018, Mr. Strzok's text messages caused significant concern regarding the handling of the Midyear investigation and reflected potential bias within FBI, making them the proper subject of potential presidential decisionmaking. Similarly, briefing or discussion about a "gap" in retrievable FBI text messages, if there were such communications, relate to the President's proper oversight of the FBI. It also bears noting that even if characterized as a "personnel action," the evidence amassed thus far demonstrates that those responsible for the action were not influenced by President Trump, as discussed further below.

Mr. Strzok's remaining arguments regarding the privilege are also unavailing. If perfected following a deposition, the sitting President would be invoking the Presidential Communications

8

Privilege. *Contra id.* at 15–16. Moreover, only a relatively short amount of time—less than five years—has passed since the alleged communications at issue, and disclosure of such recent discussions would be especially likely to chill communications within the White House. *See Trump v. Thompson,* 20 F.4th 10, 46 (D.C. Cir. 2021). Finally, Mr. Strzok argues that there is no public interest in maintaining confidentiality of presidential communications because former President Trump has made public statements regarding Mr. Strzok. *See* Strzok's Opp'n to Mot. to Quash at 16–17. Yet, Mr. Strzok points to no "public testimony," or any other public statements, revealing the confidential presidential communications he seeks to obtain, and so the authority he cites is not helpful to him. *See U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*, 351 F. Supp. 3d 140, 153–54 (D.D.C. 2018) (finding reduced public interest in confidentiality where "there has been considerable public testimony about Treasury's decision-making process"). Indeed, the former President's public statements serve only to diminish Mr. Strzok's need for the presumptively privileged information he seeks, as discussed below.

> **C.     Mr. Strzok Cannot Make a Focused Demonstration of Need Sufficient to Overcome the Presidential Communications Privilege.**

In light of the principles above, courts have required litigants to make an initial showing of heightened, particularized need for the information they seek before the burden shifts to the President to formally invoke the Presidential Communications Privilege. *See Dairyland Power Coop. v. United States*, 79 Fed. Cl. 659, 662 (2007) ("[I]n the case of a discovery request aimed at the President and his close advisors, the White House need not formally invoke the presidential communications privilege until the party making the discovery request has shown a heightened need for the information sought. This is the teaching of both *Cheney* and *[In re] Sealed Case*."). Assuming, for the sake of argument, that the Court were to permit the proposed depositions to proceed, that there would be questions that the witnesses were instructed not to answer on the basis

9


of the Presidential Communications Privilege, that Mr. Strzok moved to compel that testimony, and that the sitting President perfected those protective privilege assertions, Mr. Strzok would not be able to overcome the privilege and compel the testimony he seeks, because he could not possibly make a "focused demonstration of need[.]" *In re Sealed Case*, 121 F.3d at 746.

By way of illustration, to demonstrate the difficulty of overcoming the privilege, to meet this heavy burden of "specific need" in a criminal matter, the party seeking the privileged presidential communications must first demonstrate "that each discrete group of the subpoenaed materials likely contains important evidence"—that is, evidence "directly relevant to issues that are expected to be central to the trial[,]" and not evidence that is "only tangentially relevant or would relate to side issues[.]" *Id.* at 753–55. The party seeking the discovery must also "detail [its] efforts" "to determine whether sufficient evidence can be obtained elsewhere," and "explain why [notwithstanding other sources of information,] evidence covered by the presidential communications privilege is still needed." *Id.* at 755 (explaining this standard reflects the Supreme Court's "insistence that privileged presidential communications should not be treated as just another source of information").

Where, as here, privileged material is sought for use in a civil case, the burden to overcome the presidential communications privilege is even greater. The greater scrutiny is appropriate because "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions'" as a request for information in a criminal case. *Cheney*, 542 U.S. at 384 (quoting *Nixon*, 418 U.S. at 711); *see also U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, 3 (D.C. Cir. 2017) (faulting district court for failing to "account for how the public interests in this [civil] case differ from those presented in our prior decisions," such as that "'the need for information in the criminal context is much weightier' than the need in the civil context.") (quoting

10

*Cheney*, 542 U.S. at 384); *In re Sealed Case*, 121 F.3d at 754 (noting "the [*Nixon*] Court's repeated emphasis on the importance of access to relevant evidence in a criminal proceeding"); *Am. Historical Ass'n*, 402 F. Supp. 2d at 181 ("[W]hile withholding necessary materials in an ongoing criminal case constitutes an impermissible impairment of another branch's essential functions, the same could not be said of document requests in the civil context").

Mr. Strzok could not come close to making the "focused demonstration of need," *In re Sealed Case*, 121 F.3d at 746, required to overcome the Presidential Communications Privilege in this civil case, which would take establishing both (1) that the information sought is "important," and (2) that the "evidence is not available with due diligence elsewhere[.]" *Black*, 719 F. App'x at 3. Mr. Strzok's previous argument as to need was perfunctory. Strzok's Opp'n to Mot to Quash at 17 (merely arguing that "[e]vidence about any instructions or pressure that the President exerted on the FBI Director is highly relevant, given the highly unusual series of events that led to DD Bowdich overturning Ms. Will's 'FINAL' decision."). It is uncontested, however, that the former President was not the decisionmaker as to either the release of Mr. Strzok's text messages to the media or as to the termination of his employment with the FBI. Mr. Strzok has had ample opportunity to explore whether anything former President Trump said, publicly or nonpublicly, actually influenced the relevant decisions in this case, through means that would not require divulging privileged information. Mr. Strzok has come up empty every time.

Defendants have produced to Mr. Strzok tens of thousands of pages of documents, yet nothing in the production includes any suggestion that the former President or his agents informed the *Washington Post* or the *New York Times* prior to December 2, 2017 of the existence of Plaintiffs' text messages; that the former President or his agents played any part in the decision to show Plaintiffs' text messages to members of the media on December 12, 2017; or that the former

11

President influenced Mr. Bowdich's decision, either directly or indirectly, to remove Mr. Strzok from the FBI. Nor has Mr. Strzok uncovered any suggestion of the former President's involvement in response to Rule 45 subpoenas of former officials in their individual capacities and for records from NARA.

If the former President were somehow involved in any of the decisions related to the claims, one would certainly expect *some* indication of that in documents provided in discovery, given that neither the Department nor the FBI has invoked the Deliberative Process Privilege over responsive material related to the events underlying Mr. Strzok's claims, and that Defendants have protectively invoked the Presidential Communications Privilege to withhold only a single document in discovery. *See Pension Benefit Guar. Corp.*, 351 F. Supp. 3d at 159 (indicating, in the context of evaluating whether the Presidential Communications Privilege were overcome, that contemporaneous documentary evidence is *more* reliable than deposition testimony). Yet, despite conducting extensive searches using search terms and custodians negotiated with Plaintiffs' counsel, no evidence of the former President's involvement regarding the release of Plaintiffs' text messages or Mr. Strzok's dismissal exists to Defendants' knowledge (and Mr. Strzok has pointed to none). Mr. Strzok also received a production of Trump-era presidential records from the National Archives that yielded no such evidence. The fact that Mr. Strzok has not uncovered the information he had hoped to find through other means is not itself a legitimate basis to overcome the Presidential Communications Privilege—otherwise the need requirement would be essentially meaningless, because litigants could always pierce the privilege just so no stone remains unturned.

On the other hand, discovery has elicited considerable evidence indicating that the former President was *not* involved in those events. In particular, as Defendants detailed in their September 29 filing, Mr. Bowdich—who the parties agree made the decision to dismiss Mr. Strzok—testified

12

that he "never saw the President get involved in the termination of anyone beyond the politically-appointed Director," *i.e.*, former Director James Comey. Defs.' Suppl. Filing at 1. Mr. Bowdich further testified that he "did not recall" any interactions with the former President that mentioned the subject of Mr. Strzok, and that he "absolutely" did not recall Director Wray ever telling him about any meeting with President Trump. *Id.* Mr. Bowdich also described what actually did influence his decision to dismiss Mr. Strzok, which did not include anything former President Trump said or did, even though he was indeed aware of former President Trump's public remarks critical of Mr. Strzok. *Id.* at 2.

      Mr. Rosenstein, the decisionmaker on the release of the text messages, similarly testified at his deposition that while he recalled attending the mid-June 2018 meeting (approximately six months *after* the release of the text messages) with former President Trump on the findings of the approximately 570-page OIG report relating to the FBI's Midyear investigation, neither Director Wray nor Attorney General Sessions attended that meeting, and Mr. Rosenstein did not recall discussing the meeting with either of them after it occurred. *Id.* at 3. Mr. Rosenstein did not recall "the President commenting about Peter Strzok at that meeting," at all, nor did he have any recollection of the President at the meeting discussing Mr. Strzok's texts, saying that he wanted Mr. Strzok to be fired or investigated, or saying that Mr. Strzok was disloyal or committed treason. *Id.* at 4. Nor did Mr. Rosenstein recall ever discussing Mr. Strzok with Mr. Bowdich and explained it was "highly unlikely" that he ever did so; it was also his practice not to pass along to Director Wray any complaints about the FBI he heard from former President Trump. *Id.* at 3. As with Mr. Bowdich, Mr. Rosenstein testified that he was of course aware of former President Trump's public

statements about wanting Mr. Strzok to be fired, but understood those statements to be the former President's opinions and not orders.[2] *Id*. at 4.

Mr. Bowdich's and Mr. Rosenstein's testimony underscores that, despite many months of extensive discovery negotiated by the parties, and after having received responses to numerous third-party subpoenas, Mr. Strzok cannot establish any link between the former President and Mr. Strzok's claims in this litigation that could plausibly work to overcome the Presidential Communications Privilege. Due to the many public statements that former President Trump made in which he expressed his opinion about Mr. Strzok, this is not a case that depends on the decisionmakers' learning what the President said privately. To the contrary, Mr. Strzok's theory all along has been that the former President's public campaign to disparage Mr. Strzok caused Mr. Bowdich to fire him. Compl. ¶¶ 3–4. Mr. Strzok is free to argue that theory, despite Mr. Bowdich's testimony to the contrary, but Mr. Strzok does not need testimony about nonpublic presidential communications to do so.

## II. Defendants' Very Limited Anticipated Objections to Questions Based on the Deliberative Process Privilege Are Likewise Well-Taken.

The Deliberative Process Privilege protects the government's decision-making process by shielding from disclosure documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (citation omitted). The

---

[2] Defendants note that their September 29 filing, while correctly characterizing the transcript of Mr. Rosenstein's testimony then available, incorrectly characterizes the testimony as actually provided, as Mr. Rosenstein made clear in his subsequent deposition errata sheet. Footnote 3 of that filing should properly begin as follows "More broadly, Mr. Rosenstein testified that he did not recall President Trump speaking to him about Peter Strzok *at any time*, and that . . . ." *See* Lynch Decl. Ex. A at 5 re deposition at 379:19 (correcting transcription error and noting "'many' should be 'any'"); *cf.* Defs.' Suppl. Filing at 4 n.3 (citing Rosenstein Tr. at 379:18); Rosenstein Tr. at 379:16-18 (████████████).

privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public." *Judicial Watch, Inc. v. DoD*, 847 F.3d 735, 739 (D.C. Cir. 2017) (citing *Sears*, 421 U.S. at 150).

Because of the qualified nature of the privilege, *In re Sealed Case*, 121 F.3d at 737, the government has withheld deliberative information very sparingly throughout discovery, and only when there is no reasonable connection between the information sought and the elements of Mr. Strzok's claims or to the remedies sought. Consistent with that general approach, Defendants indicated in their October 18 filing that they would invoke the Deliberative Process Privilege as to only a handful of questions listed by Mr. Strzok, and only those that were so broad as to probe into predecisional deliberations unrelated to Mr. Strzok's claims. Defs.' Oct. 18 Filing at 4, 8.

For example, we indicated that we would object and instruct former President Trump and/or Director Wray not to testify about what either recalled, without limitation, regarding an alleged June 15, 2018 meeting, "'including whether any policy or other decisions were being deliberated during the meeting, and if so what they were . . . , what he learned about the IG report, [and] what questions if any he had about it.'" *Id.* at 4 (quoting Pl.'s Sept. 29, 2022 Notice). None of these questions—which pertain to general policies or decisions deliberated with the then-President of the United States and his knowledge of and questions about a broad, 570-page OIG report, only a small portion of which relates to Mr. Strzok—has any actual bearing on Mr. Strzok's claims, and certainly not a sufficient connection to overcome an assertion of the Deliberative Process Privilege.

Dated: October 28, 2022                                         Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Christopher M. Lynch*
CHRISTOPHER M. LYNCH
(D.C. Bar 1049152)
BRADLEY P. HUMPHREYS
(D.C. Bar 988057)
MICHAEL J. GAFFNEY
(D.C. Bar 1048531)
JOSHUA C. ABBUHL
(D.C. Bar 1044782)
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 353-4357
Email: Christopher.M.Lynch@usdoj.gov

*Counsel for Defendants*